**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2408
_____

CHAZON QTA QUANTITATIVE TRADING ARTISTS, L.L.C.,
and LAWRENCE I. FEJOKWU,
Petitioners

v.

COMMODITY FUTURES TRADING COMMISSION

_____

On Petition for Review from the Commodity Futures Trading Commission
(CFTC Docket No. CRAA 16-01)

Submitted under Third Circuit L.A.R. 34.1(a)
October 29, 2018

Before:  CHAGARES, JORDAN, and VANASKIE, Circuit Judges.

(Filed: December 13, 2018)

_____

OPINION[*]
_____

CHAGARES, Circuit Judge.

Lawrence Fejokwu and his company Chazon QTA Quantitative Trading Artists,

L.L.C. ("Chazon") were permanently barred from membership in the National Futures

_____

[*]     This disposition is not an opinion of the full Court and under I.O.P. 5.7 does not
constitute binding precedent.

Association (NFA) for failing to cooperate promptly and fully with an NFA investigation. They appealed to the Commodity Futures Trading Commission (CFTC), which upheld the NFA's finding and sanction. Now they petition this Court to review that decision under 7 U.S.C. § 21(i)(4). We will deny the petition.

I.

Because we write only for the parties, we recite just those facts necessary to our decision.

Fejokwu is the founder of two foundations, the Vision Foundations, that focus on pan-African socioeconomic development. In April 2011, Chazoneering, S.A., an entity solely owned and operated by Fejokwu, transferred $1.6 million to the Vision Foundations. The Vision Foundations used that money to fund the Maria Funds, a pair of commodity pools operated by Chazon. Fejokwu registered Chazon with the NFA as a commodities pool operator, with himself as its principal.

From the beginning, the Maria Funds suffered significant losses. The funds had only $125,000 remaining by March 2014.

At that point, Fejokwu applied to withdraw Chazon from the NFA to save costs. Fejokwu argued that he and Chazon were exempt from NFA registration under the so-called small-pool exemption, 17 C.F.R. § 4.13(a)(2). That exemption provides that a commodities pool operator need not register with the NFA if none of its pools has more than 15 participants and the total gross capitalization of all of its pools does not exceed $400,000, excluding the operator's and principal's own money.

2

Fejokwu's withdrawal request triggered an NFA investigation. Fejokwu at first cooperated with the investigation, providing on request the Vision Foundations' organizational documents, balance sheets, and ledgers, the Maria Funds' 2013 bank statements, and Chazon's bank and broker statements. On further request, Fejokwu also provided the Maria Funds' and the Vision Foundations' bank statements from 2011.

The NFA then asked for Chazoneering's bank statements. Fejokwu balked at this request. He felt that he had already provided sufficient evidence that the small-pool exemption applied and that the NFA was not entitled to Chazoneering's documents since that entity was not an NFA member and did not trade futures. He ultimately provided the LLC agreement and 2013 and 2014 bank statements for Chazoneering, LLC — a different entity than the one that indirectly capitalized the Maria Funds.[1] But he refused to provide any Chazoneering bank statements from 2011, when the Vision Foundations were funded. He then added the Vision Foundations as listed principals of Chazon, which arguably made review of Chazoneering's bank statements unnecessary — because listing the Visions Foundations as Chazon principals made clear that all the Maria Funds' money came from Chazon principals. When the NFA still insisted, Fejokwu asked to discuss the request with NFA lawyers or supervisors. Rather than give him that opportunity, the NFA concluded its investigation with a finding that Fejokwu had failed to cooperate.

---

[1] In this opinion, we differentiate between the Chazoneering entities only when the distinction is relevant.

3

The NFA then filed a formal complaint charging Fejokwu and Chazon with violating NFA Compliance Rule 2-5. That rule requires each NFA member and associate to cooperate promptly and fully with the NFA in any NFA investigation, inquiry, audit, examination, or proceeding regarding compliance with NFA requirements or any NFA disciplinary or arbitration proceeding. Fejokwu and Chazon filed an answer, and the NFA held a hearing, at which Fejokwu and an NFA examiner testified.

The NFA hearing panel issued a decision finding that Fejokwu and Chazon had willfully violated Rule 2-5. The panel determined that the NFA legitimately requested Chazoneering's bank statements from the time it funded the Vision Foundations because the NFA questioned the ultimate source of Chazon's capital contributions and thus its eligibility for the small-pool exemption, among other reasons. The panel found that Fejokwu was "very vague" about where Chazoneering got the money and that he "actually appeared to be trying to deceive NFA" about the different Chazoneering entities, which raised issues about his credibility. Appendix ("App.") 39. "Moreover," the panel explained, "the sudden listing of the Vision Foundations . . . appeared to have been an attempt by Fejokwu to find a reason not to provide the Chazoneering statements," which "gave NFA legitimate concerns as to the funding of Chazoneering." App. 40. Since the NFA's request for the Chazoneering bank statements was legitimate, the panel found that Fejokwu and Chazon willfully violated Rule 2-5 by refusing to provide them. As a sanction, the panel permanently barred Fejokwu and Chazon from NFA membership.

4

Fejokwu and Chazon appealed to the NFA Appeals Committee, which upheld the panel's conclusion and declined to modify its sanction. On the sanction, the appeals committee emphasized the importance of member cooperation to the NFA's effectiveness. It also rejected Fejokwu's argument that the violations were not willful, finding them to be "a conscious decision" and pointing out that Fejokwu "knowingly misled" the examination team about the different Chazoneering entities. App. 21–22. While there was no evidence that Fejokwu harmed customers or committed fraud, the committee explained, "that may simply be because the documents [Fejokwu and Chazon] refused to produce contained or led to such evidence." App. 22. Given this "very grave violation" and the "significance of" Rule 2-5, the appeals committee found the sanction "completely appropriate." App. 22.

Fejokwu and Chazon appealed this decision to the CFTC, which summarily affirmed. They then timely petitioned for review.

## II.

The NFA and CFTC had jurisdiction over the underlying disciplinary proceeding under 7 U.S.C. § 21(b), (h). We have appellate jurisdiction to review the CFTC's order upholding the NFA's decision under 7 U.S.C. § 21(i)(4). We are satisfied that jurisdiction is proper in this Court rather than in the Court of Appeals for the Second Circuit despite Chazon's New York post-office box since the record suggests that Fejokwu carried out Chazon's business out of his home office in Guttenberg, New Jersey. See 7 U.S.C. §§ 9(11)(B)(ii)(I), 21(i)(4). We are also satisfied — and the CFTC does

5

not contest — that we have jurisdiction over the now-represented corporate appellant Chazon.

We review the factual determinations of an administrative agency "to determine whether there is substantial evidence to support [its] decision." Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). We review the agency's decision to uphold sanctions for abuse of discretion. See, e.g., Butz v. Glover Livestock Comm'n Co., Inc., 411 U.S. 182, 185–86 (1973).

## III.

Fejokwu and Chazon argue that substantial evidence does not show that they willfully violated Rule 2-5 and that a permanent bar was unwarranted and unjustified. We disagree.

## A.

There is no dispute that Fejokwu and Chazon could have provided Chazoneering's 2011 bank statements but refused. Fejokwu instead argues that his refusal to cooperate did not violate Rule 2-5 because the NFA had no legitimate regulatory reason for requesting those statements. The NFA found that there was a legitimate regulatory need to confirm Chazon's eligibility for the small-pool exemption. We conclude that substantial evidence supported that finding.

Fejokwu relied on the small-pool exemption to withdraw from the NFA, giving it a legitimate reason to investigate Chazon's eligibility for this exemption. Since the exemption requires aggregate nonproprietary capital contributions to be under $400,000, the NFA had legitimate grounds to confirm that Chazoneering's $1.6 million investment

6

was in fact proprietary — that is, legitimate business income of Chazoneering (and thus of Fejokwu) and not merely customer contributions funneled through Chazoneering to invest in the Maria Funds without proper registration. Inquiring where Chazoneering got the $1.6 million was fair game. And Fejokwu gave the NFA reason to be suspicious of its source. He was cagey about the different Chazoneering entities, vague on Chazoneering's actual business, and protective of only the bank statements that showed where Chazoneering got these funds. The NFA thus legitimately insisted on reviewing Chazoneering's 2011 bank statements to confirm Chazon's eligibility for the small-pool exemption.[2] Fejokwu's refusal may not have been in bad faith, but no doubt it was voluntary and intentional — which makes it "willful" in the civil context. See, e.g., Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 57 & n.9 (2007); Vineland Fireworks Co. v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 544 F.3d 509, 517 (3d Cir. 2008) ("[T]he legal definition of 'willful' . . . is '[v]oluntary and intentional, but not necessarily malicious.'" (quoting Black's Law Dictionary 1630 (8th ed. 2004)) (alteration in original)). Thus, substantial evidence shows that Fejokwu and Chazon willfully violated Rule 2-5.

---

[2] The NFA hearing panel also concluded that the NFA had legitimately asked for Chazoneering's 2011 bank statements to determine whether Chazon had any unlisted principals. Fejokwu argues that Chazoneering's bank statements would not show anyone's direct contributions to Chazon or direct or indirect ownership interests in Chazon, and so could not show unlisted principals. Since we conclude that confirming eligibility for the small-pool exemption was a legitimate regulatory reason to review the 2011 statements, we do not reach this alternative justification.

B.

Fejokwu also argues that the CFTC abused its discretion by upholding the NFA's permanent membership ban. We will overturn an agency's decision to uphold sanctions as an abuse of discretion only if the sanctions are "unwarranted in law or . . . without justification in fact." Butz, 411 U.S. at 185–86 (alteration in original). "Typically, such an abuse of discretion will involve either a sanction palpably disproportionate to the violation or a failure to support the sanction chosen with a meaningful statement of 'findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record.'" Reddy v. Commodity Futures Trading Comm'n, 191 F.3d 109, 124 (2d Cir. 1999) (quoting 5 U.S.C. § 557(c)(3)(A)).

Fejokwu first argues that a permanent ban was palpably disproportionate to the violation. In comparison to other cases, he argues, his would be "the only instance where the NFA has permanently banned a first-time offender for violating Rule 2-5 without any additional aggravating" circumstances. Fejokwu Br. 46. But, on the contrary, there were aggravating circumstances here. Fejokwu was not merely intransigent; the NFA found him deceptive, misleading, and intentionally vague. No doubt the sanction is severe, but given these circumstances we cannot say that it is unwarranted in law or without justification in fact. Thus the CFTC did not abuse its discretion by upholding it.

Fejokwu next argues that the CFTC's summary decision fails to provide a meaningful statement of the reason for the sanction. We disagree. Both the NFA panel and appeals committee discussed the reasons for the sanction at some length. These decisions emphasized the importance of Rule 2-5, but also Fejokwu's misleading conduct

8

in the investigation and hearing. The CFTC expressly adopted these findings and conclusions, and it also held that "the choice of sanction is neither excessive nor oppressive in light of the violation and the public interest." App. 7. No doubt Fejokwu wishes that the NFA had credited other, mitigating factors, but he still received a meaningful statement of the findings, conclusions, and reasons underpinning the chosen sanction. We cannot conclude that the CFTC abused its discretion by adopting the NFA's reasons and upholding its sanction.

## IV.

For these reasons, we will deny the petition for review.